Citation Nr: 1101582 
Decision Date: 01/13/11 Archive Date: 01/20/11

DOCKET NO. 05-00 673 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs (VA) Regional Office (RO) in
Pittsburgh, Pennsylvania


THE ISSUES

1. Entitlement to service connection for residuals of shell 
fragment wounds of the legs. 
 
2. Entitlement to service connection for peripheral vascular 
disease of the lower extremities, to include as secondary to 
residuals of shell fragment wounds of the legs. 
 
3. Entitlement to an initial higher (compensable) rating for 
prostate cancer. 
 
4. Entitlement to an initial higher (compensable) rating for 
erectile dysfunction. 

5. Entitlement to service connection for a psychiatric disorder, 
to include post-traumatic stress disorder (PTSD). 




REPRESENTATION

Appellant represented by: The American Legion


ATTORNEY FOR THE BOARD

S. D. Regan, Counsel


INTRODUCTION

The Veteran had active service from February 1966 to February 
1969. 

This matter comes before the Board of Veterans' Appeals (Board) 
on appeal from an April 2004 RO rating decision that granted 
service connection and a 100 percent rating for prostate cancer 
from January 21, 2003 to February 28, 2004, and a noncompensable 
rating since March 1, 2004, and granted service connection and a 
noncompensable rating for erectile dysfunction, effective January 
21, 2003. By this decision, the RO also denied service 
connection for the following conditions: PTSD; residuals of 
shell fragment wounds of the legs; and peripheral vascular 
disease of the lower extremities, to include as secondary to 
residuals of shell fragment wounds of the legs. 

The Board notes that the Veteran's contentions as to the issue of 
entitlement to an initial higher (compensable) rating for 
prostate cancer essentially pertain to the evaluation of the 
severity of his condition since March 1, 2004, the date a 
noncompensable rating was assigned. 

In a September 2008 decision, the Board denied the Veteran's 
claim for entitlement to service connection for PTSD. The Board 
remanded the issues of entitlement to service connection for 
residuals of shell fragment wounds of the legs; entitlement to 
service connection for peripheral vascular disease of the lower 
extremities, to include as secondary to residuals of shell 
fragment wounds of the legs; entitlement to an initial higher 
(compensable) rating for prostate cancer; and entitlement to an 
initial higher (compensable) rating for erectile dysfunction, for 
further development. 

The Veteran then appealed the Board's decision, as to the issue 
of entitlement to service connection for PTSD, to the United 
States Court of Appeals for Veterans Claims (Court). In December 
2009, the parties (the Veteran and the VA Secretary) filed a 
joint motion which requested that the Board's decision as to that 
issue be vacated and remanded. A January 2010 Court Order 
granted the motion. 

The issues of entitlement to service connection for a 
psychiatric disorder, to include PTSD, is addressed in the 
REMAND portion of the decision below and are REMANDED to 
the RO via the Appeals Management Center (AMC), in 
Washington, DC.


FINDINGS OF FACT

1. The Veteran does not have residuals of shell fragment wounds 
of the legs. 

2. The Veteran's peripheral vascular disease was not present 
during service or for many years thereafter, and was not caused 
by any incident of service. The Veteran also claims service 
connection for peripheral vascular disease, to include as 
secondary to service-connected residuals of shell fragment wounds 
of the legs, but he is not currently service-connected for 
residuals of shell fragment wounds of the legs. 

3. Since March 1, 2004, the Veteran's service-connected prostate 
cancer is manifested by urinary frequency with a daytime voiding 
interval between one and two hours, or awakening to void three to 
four times per night. His prostate cancer is not manifested by 
renal dysfunction. 

4. The Veteran's service-connected erectile dysfunction is 
manifested by an inability to achieve erections, but without any 
deformity. 


CONCLUSIONS OF LAW

1. Residuals of shell fragment wounds were not incurred in or 
aggravated by service. 38 C.F.R. 1101, 1110, 1112, 1113, 5107 
(West 2002); 38 C.F.R. § 3.303 (2009). 

2. Peripheral vascular disease was not incurred in or aggravated 
by service and service connection for peripheral vascular disease 
as secondary to residuals of shell fragment wounds is precluded 
by law. 38 C.F.R. 1101, 1110, 1112, 1113, 5107 (West 2002); 38 
C.F.R. §§ 3.303, 3.310 (2009). 

3. The criteria for an initial rating of 20 percent for prostate 
cancer have been met continuously since March 1, 2004. 38 
U.S.C.A §§ 1155, 5107 (West 2002); 38 C.F.R. §§ 4.115a, 4.115b, 
Diagnostic Codes 7527, 7528 (2008). 

4. The criteria for an initial higher (compensable) rating for 
erectile dysfunction have not been met. 38 U.S.C.A §§ 1155, 5107 
(West 2002); 38 C.F.R. §§ 4.20, 4.31, 4.115b, Diagnostic Code 
7522 (2009). 


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Duty to Notify and Assist

Upon receipt of a complete or substantially complete application, 
VA must notify the claimant and any representative of any 
information, medical evidence, or lay evidence not previously 
provided to VA that is necessary to substantiate the claim. This 
notice requires VA to indicate which portion of that information 
and evidence is to be provided by the claimant and which portion 
VA will attempt to obtain on the claimant's behalf. See 38 
U.S.C.A. §§ 5103, 5103A, 5107; 38 C.F.R. § 3.159. The notice 
should inform the claimant about the information and evidence not 
of record that is necessary to substantiate the claim. It should 
also inform the claimant about the information and evidence that 
VA will seek to provide, and the information and evidence the 
claimant is expected to provide. See Pelegrini v. Principi, 18 
Vet. App. 112, 120-21 (2004). 

Here, the RO sent correspondence in July 2003, a rating decision 
in April 2004, a statement of the case in December 2004, 
correspondence in January 2005, and correspondence in October 
2008. These documents discussed specific evidence, the 
particular legal requirements applicable to the claims, the 
evidence considered, the pertinent laws and regulations, and the 
reasons for the decision. VA made all efforts to notify and to 
assist the appellant with regard to the evidence obtained, the 
evidence needed, and the responsibilities of the parties in 
obtaining the evidence. The Board finds that any defect with 
regard to the timing or content of the notice to the appellant is 
harmless because of the thorough and informative notices provided 
throughout the adjudication and because the appellant had a 
meaningful opportunity to participate effectively in the 
processing of the claims with an adjudication of the claims by 
the RO subsequent to receipt of the required notice. There has 
been no prejudice to the appellant, and any defect in the timing 
or content of the notices has not affected the fairness of the 
adjudication. See Mayfield v. Nicholson, 19 Vet. App. 103 
(2005), rev'd on other grounds, 444 F.3d 1328 (Fed. Cir. 2006) 
(specifically declining to address harmless error doctrine); see 
also Dingess v. Nicholson, 19 Vet. App. 473 (2006). Thus, VA has 
satisfied its duty to notify the appellant. The case was last 
readjudicated in a November 2009 supplemental statement of the 
case. 

In addition, all relevant, identified, and available evidence has 
been obtained, and VA has notified the appellant of any evidence 
that could not be obtained. The appellant has not referred to 
any additional, unobtained, relevant evidence. VA has also 
obtained medical examinations in relation to these claims. Thus, 
the Board finds that VA has satisfied both the notice and duty to 
assist provisions of the law. 






Analysis

I. Residuals of Shell Fragment Wounds of the Legs

Service connection may be granted for a disability resulting from 
disease or injury incurred in or aggravated by service. 
38 U.S.C.A. § 1110; 38 C.F.R. § 3.303(a). Service connection for 
a "chronic disease," may be granted if manifest to a 
compensable degree within one year of separation from service. 
38 U.S.C.A. §§ 1101, 1112, 1113; 38 C.F.R. §§ 3.307, 3.309. 
Service connection may also be granted for any disease diagnosed 
after discharge when all of the evidence establishes that the 
disease was incurred in service. 38 C.F.R. § 3.303(d). 

Secondary service connection may be granted for a disability 
which is proximately due to, the result of, or aggravated by an 
established service-connected disability. 38 C.F.R. § 3.310; see 
also Allen v. Brown, 7 Vet. App. 439 (1995). The Board notes 
that effective October 10, 2006, 38 C.F.R. § 3.310 was amended to 
conform with the decision of the United States Court of Appeals 
for Veterans Claims (Court) in Allen; however, based upon the 
facts in this case the regulatory change does not impact the 
outcome of the appeal. 

To prevail on the issue of service connection, there must be 
medical evidence of a current disability; medical evidence, or in 
certain circumstances, lay evidence of in-service occurrence or 
aggravation of a disease or injury; and medical evidence of a 
nexus between an in-service injury or disease and the current 
disability. See Hickson v. West, 12 Vet. App. 247, 253 (1999).

The chronicity provision of 38 U.S.C.A. § 3.303(b) is applicable 
where the evidence, regardless of its date, shows that the 
Veteran had a chronic condition in service or during an 
applicable presumption period and still has such condition. Such 
evidence must be medical unless it relates to a condition as to 
which, under the Court's case law, lay observation is competent. 
Savage v. Gober, 10 Vet. App. 488, 498 (1997). In addition, if a 
condition noted during service is not shown to be chronic, then 
generally a showing of continuity of symptomatology after service 
is required for service connection. 38 U.S.C.A. § 3.303(b).

When all the evidence is assembled, VA is responsible for 
determining whether the evidence supports the claim or is in 
relative equipoise, with the Veteran prevailing in either event, 
or whether a preponderance of the evidence is against a claim, in 
which case, the claim is denied. Gilbert v. Derwinski, 1 Vet. 
App. 49 (1990). 

Further, as a finder of fact, the Board, when considering whether 
lay evidence is satisfactory, the Board may also properly 
consider internal inconsistency of the statements, facial 
plausibility, consistency with other evidence submitted on behalf 
of the Veteran, and the Veteran's demeanor when testifying at a 
hearing. See Dalton v. Nicholson, 21 Vet. App. 23, 38 (2007); 
Caluza v. Brown, 7 Vet. App. 498, 511 (1995), aff'd per curiam, 
78 F.3d 604(Fed.Cir.1996).

The Veteran contends that he has residuals of shell fragment 
wounds of the legs that are related to his period of service. He 
specifically alleges that while on patrol in Vietnam the enemy 
fired a rocket and he received shrapnel wounds to, apparently, 
both legs. 

The Veteran's service personnel records indicate that he was not 
awarded decorations evidencing combat, to include the Purple 
Heart Medal. He had one year and twenty-seven days of foreign 
and/or sea service. His occupational specialty was listed as a 
combat engineer. A January 2004 response from the National 
Personnel Records Center (NPRC) indicated that the Veteran served 
in Vietnam from July 1966 to January 1967 and from March 1967 to 
August 1967. His service personnel records also included 
notations that he participated in counter-insurgency operations 
in the Republic of Vietnam with "III MAF" and that he 
participated in Operation Prairie, Phase III, in the Quan Tri 
Province of the Republic of Vietnam. He served with various 
companies in the 3rd Marine Division and the 9th Marine Division 
in Vietnam. 

The Veteran's service treatment records do not show complaints, 
findings, or diagnoses of any shell fragment wounds, including of 
the right and left leg. 

The first post-service evidence of record of any possible 
residuals of shell fragment wounds is in November 1998, many 
years after the Veteran's period of service. This lengthy period 
without treatment is evidence against a finding of continuity of 
symptomatology, and it weighs heavily against the claim. See 
Maxson v. West, 12 Vet. App. 453 (1999), aff'd, 230 F.3d 1330 
(Fed. Cir. 2000) (service incurrence may be rebutted by the 
absence of medical treatment of the claimed condition for many 
years after service). 

A November 1998 VA general medical examination report noted that 
the Veteran was in Vietnam between 1966 and 1968. He stated that 
while he was in Vietnam, he was on patrol and the enemy came over 
and fired a rocket. The Veteran indicated that he suffered 
shrapnel injuries to both the right leg and to the right arm 
which resulted in some scar formation, but which were no longer a 
bother to him. The diagnoses included peripheral vascular 
disease; status post a femoral-popliteal bypass graft on the 
right lower extremity with a pending femoral-popliteal bypass 
graft on the left lower extremity; prominence of the 
anterosuperior margin of the right talus; and radiographically 
normal knees. The diagnoses did not refer to any shell fragment 
wounds of the legs. 

A November 1998 VA orthopedic examination report essentially 
related the same information as to the Veteran's military 
service. The diagnoses were essentially the same as noted above 
and did not refer to any shell fragment wounds. A November 1998 
X-ray report, as to the Veteran's knees, related an impression of 
radiographically normal knees. 

Subsequent post-service private and VA treatment records include 
references to shell fragment wounds of the legs. 

For example, a March 2003 bone scan report from Mercy Jeannette 
Hospital indicated that the Veteran reported that he had an 
injury to both lower legs during the Vietnam War and that he had 
metallic shrapnel in both lower legs. As to a conclusion, the 
examiner noted that the Veteran had "focal increased abnormal 
signal intensity in both lower legs, most likely related to 
injury from Vietnam War with shrapnel in both lower 
extremities." It was also reported that the remaining axial 
skeletal system appeared normal with no bone metastasis 
identified. 

An April 2004 VA psychiatric examination report noted that the 
Veteran reported that he was hit in both legs by shell fragments 
from a rocket attack near Dong Ha, although he did not know 
exactly when such occurred. The diagnoses referred to other 
disorders. 

An April 2004 consultation report from Mercy Jeannette Hospital 
noted, as to history, that the Veteran reported that he had a 
Vietnam War injury in the lower leg with fragments of metal left 
in. As to the Veteran's extremities, the examiner reported that 
the pulses were decreased. The examiner indicated that the 
Veteran had a history of bypass surgeries in July 1998, December 
1998, and July 2000, by a private physician, and that the last 
surgery was a bilateral aorto femoral bypass. No diagnoses were 
provided at that time. 

A July 2009 VA arteries, veins, and miscellaneous examination 
report indicated that the Veteran's claims file was reviewed. 
The Veteran reported that he suffered shrapnel wounds to the 
bilateral lower extremities during combat. The examiner noted 
that such information was not documented and that the Veteran did 
not give a specific time for the shrapnel wounds. The examiner 
indicated that they would have occurred during his service time 
between "1965-1972", per the Veteran. The Veteran stated that 
approximately ten years ago, he began to have symptoms of 
peripheral vascular disease and that the condition had worsened 
during that time. It was noted that the Veteran underwent a 
femoral popliteal bypass in the right leg in 1998 and repeat 
right femoral popliteal bypass and a right to left bypass in 2000 
and 2001, respectively. The Veteran reported that the surgeries 
had only slightly improved his circulation by approximately 20 
percent and that he had decreased circulation to his extremities. 
He indicated that the skin on his feet became very light, or 
pale, and that his present symptoms included pain that increased 
with walking. He remarked that he had numbness with occasional 
sharp pain and cramping. 

The Veteran reported that ten years earlier, his pain was 
intermittent with numbness, and only occasional sharp pain. He 
stated that it would increase with walking and cramping. He 
stated that, presently, his pain could happen spontaneously at 
any time. It was noted that there were no known exacerbating or 
alleviating factors other than that increased walking could bring 
on the symptoms. The Veteran reported that he was not currently 
being treated for his peripheral vascular disease other than with 
medication management without side-effects. He indicated that he 
had general fatigue otherwise and that he continued to have 
recurrent symptoms after his surgeries. The Veteran stated that 
in general his condition was in the lowered extremities below the 
knees. The examiner noted that previous records reported calf 
pain with ambulating. It was noted that the Veteran did not have 
a history of varicosities. 

The examiner reported that the Veteran did not have muscle loss 
from his claimed shrapnel injuries and that, again, he did not 
give a specific date of onset. The examiner indicated that the 
Veteran did not report any flare-ups of muscle injuries, no 
severity, no duration, and no precipitating or alleviating 
factors. The examiner stated that the Veteran did not report any 
limitation of motion or functional impairment. The examiner also 
reported that the Veteran did not report any current muscle pain. 

The examiner indicated that the Veteran reported primarily that 
he had shrapnel injuries to the front of the lower extremities. 
The examiner stated that the Veteran was unable to point out any 
scarring from the shrapnel. The examiner reported that there was 
no scarring visualized to the anterior and posterior lower 
extremities below the knees and between the knees and the ankles. 
The examiner remarked that there was no muscle tendon loss, no 
obvious deformities, and no anterior exit wounds. It was noted 
that there was no apparent bone, joint, or nerve damage, and no 
muscle herniation. The examiner indicated that the Veteran had 
normal muscle strength and no loss of muscle function. The 
examiner related that the Veteran had trace edema of the right 
ankle, with none to the left. It was noted that there was no 
painful scarring and no skin breakdown due to know scarring. The 
examiner indicated that she was unable to determine depth, 
underlying soft tissue damage, limitation of motion, or other 
limitation of function because there was no scarring. The 
examiner further remarked that she was unable to determine 
inflammation, edema, keloid formation, length/width, adherence to 
underlying tissue, depression, elevation to palpation, abnormal 
texture, pigmentation, induration or inflexibility, or underlying 
tissue loss on scars that did not exist. An X-ray, as to the 
Veteran's bilateral tibia and fibula, related an impression of no 
radiographic abnormality identified in the left or right tibia 
and fibula. 

As to diagnoses, the examiner indicated that shell fragment 
wounds of the lower extremities between the ankles and the knees 
were not established at that time. The examiner stated that 
"there [was] no medical evidence, no evidence per claims file 
review, [and] no visualized scarring." The examiner commented 
that "any peripheral vascular disease of the lower extremities 
would not be secondary to shell fragment wound since no evidence 
is found. Most likely secondary to Veteran's history of smoking, 
hyperlipidemia, and alcohol intake." The examiner further 
indicated that shell fragment wounds of the bilateral lower 
extremities were not found at that time. The examiner stated 
that there was no medical evidence of shell fragment wounds, no 
muscle tissue loss, no visualized scarring, and no retained 
fragments found on X-ray. 

In evaluating the probative value of competent medical evidence, 
the United States Court of Appeals for Veterans Claims 
(hereinafter Court) has stated, in pertinent part:

The probative value of medical opinion 
evidence is based on the medical expert's 
personal examination of the patient, the 
physician's knowledge and skill in 
analyzing the data, and the medical 
conclusion that the physician reaches. . . 
. As is true with any piece of evidence, 
the credibility and weight to be attached 
to these opinions [are] within the province 
of the adjudicators; . . .

Guerrieri v. Brown, 4 Vet. App. 467, 470-71 (1993). 

As stated by the Court, the determination of credibility is the 
province of the Board. It is not error for the Board to favor 
the opinion of one competent medical expert over that of another 
when the Board gives an adequate statement of reasons or bases. 
See Owens v. Brown, 7 Vet. App. 429, 433 (1995). 

As stated above, there are no personnel records or medical 
records or record of examination from the Veteran's period of 
service ending in 1969, that document any shell fragment wounds 
to the legs. No complaints or findings of such are reported for 
nearly 30 years after service. 

While the Veteran has given a history of shell fragment wound in 
the legs, the Board doubts the credibility of this history. In 
addition to the lack of any supporting evidence from service or 
for nearly three decades after service, the Board is keenly aware 
of the fact that medical professionals have only started 
including a history of shell fragment wounds in documents since 
the Veteran reported that history in 1998. The Board finds it 
pertinent, however, that despite the Veteran's reports of a 
history of shell fragment wounds to the legs, medical 
professionals have not found any objective evidence of such. 

The Board observes that a November 1998 VA general medical 
examination report noted that the Veteran reported that while he 
was in Vietnam, he was on patrol and the enemy came over and 
fired a rocket. The Veteran indicated that he suffered shrapnel 
injuries to both the right leg and to the right arm which 
resulted in some scar formation, but which were no longer a 
bother to him. The diagnoses did not refer to any shell fragment 
wounds of the legs. Additionally, a November 1998 VA orthopedic 
examination report essentially related the same information as to 
the Veteran's military service. The diagnoses did not refer to 
any shell fragment wounds. Further, the Board notes that an 
April 2004 psychiatric examination report noted that the Veteran 
reported that he was hit in both legs by shell fragments from a 
rocket attack near Dong Ha, although he did not know exactly when 
such occurred. The diagnoses referred to other disorders. Also, 
an April 2004 consultation report from Mercy Jeannette Hospital 
noted, as to history, that the Veteran reported that he had a 
Vietnam War injury in the lower leg with fragments of metal left 
in. The Board observes that the Veteran's statements above 
indicating that he suffered shell fragment wounds during his 
period of service were nothing more than a recitation of his 
belief. This recited history of shell fragment wound to the legs 
has not been supported by any objective medical findings. As 
such, any repetitions of these statements by doctors reciting a 
reported medical history, are not probative in linking any the 
Veteran's claimed residuals of shell fragment wounds of the legs 
with his period of service. See LeShore v. Brown, 8 Vet. App. 
406, 409 (1995) (a bare transcription of a lay history is not 
transformed into competent medical evidence merely because the 
transcriber is a medical professional). 

Additionally, the Board notes that a March 2003 bone scan report 
from Mercy Jeannette Hospital indicated that the Veteran reported 
that he had an injury to both lower legs during the Vietnam War 
and that he had metallic shrapnel in both lower legs. As to a 
conclusion, the examiner noted that the Veteran had "focal 
increased abnormal signal intensity in both lower legs, most 
likely related to injury from Vietnam War with shrapnel in both 
lower extremities." It was also reported that the remaining 
axial skeletal system appeared normal with no bone metastasis 
identified. The Board observes that there is no indication that 
the examiner reviewed the Veteran's claims file in providing the 
opinion that the Veteran had focal increased abnormal signal 
intensity in the lower legs related to shrapnel injuries in both 
lower extremities from the Vietnam War. Although an examiner can 
render a current diagnosis based on his examination of a 
claimant, without a thorough review of the record, his opinion 
regarding etiology if based on facts reported by the claimant can 
be no better than the facts alleged by the claimant. See Swann 
v. Brown, 5 Vet. App. 229 (1993). Additionally, the Board 
observes that without a review of the claims file in this case, 
an examiner is unable to review the positive and negative 
opinions of record addressing the etiology of the Veteran's 
alleged shell fragment wounds, as well as the Veteran's medical 
history, and thereby provide a fully informed opinion. See also 
Nieves-Rodriguez v. Peake, 22 Vet. App. 295 (2008). Given these 
circumstances, the opinion provided pursuant to the March 2003 
bone scan report from Mercy Jeannette Hospital has no probative 
value in this matter. 

Conversely, the Board observes that the July 2009 VA arteries, 
veins, and miscellaneous examination report indicated that the 
Veteran's claims file was reviewed. The examiner had the 
opportunity to review service treatment records and all records 
on file and see firsthand that the records showed no 
documentation of shell fragment wounds to the legs. As to 
diagnoses, the examiner indicated that shell fragment wounds of 
the lower extremities between the ankles and the knees were not 
established at that time. The examiner stated that "there [was] 
no medical evidence, no evidence per claims file review, [and] no 
visualized scarring." The examiner commented that "any 
peripheral vascular disease of the lower extremities would not be 
secondary to shell fragment wound since no evidence is found. 
Most likely secondary to Veteran's history of smoking, 
hyperlipidemia, and alcohol intake." The examiner further 
indicated that shell fragment wounds of the bilateral lower 
extremities were not found at that time. The examiner stated 
that there was no medical evidence of shell fragment wounds, no 
muscle tissue loss, no visualized scarring, and no retained 
fragments found on X-ray. The Board notes that the VA examiner 
reviewed the Veteran's entire claims file, discussed his medical 
history, and provided rationales for her opinions. Therefore, 
the Board finds that the VA examiner's opinions are the most 
probative in this matter. See Wensch v. Principi, 15 Vet. App. 
362 (2001). 

Further, in its role as a finder of fact, the Board observes that 
the Veteran has inconsistently reported suffering shrapnel wounds 
to his right leg and right arm pursuant to November 1998 VA 
examination reports, and then reporting shrapnel wounds to the 
front of both legs at the July 2009 VA arteries, veins, and 
miscellaneous examination. Also, the Veteran's service treatment 
records show no evidence of any shell fragment wounds and his 
service personnel records do not show that he received the Purple 
Heart Medal. Thus, the credibility and probative value of his 
accounts regarding the alleged shell fragment wounds is 
undermined. See Dalton, Caluza, supra. Simply put, the Board 
does not find the Veteran's statements credible in light of the 
lack of objective findings of shell fragment wounds during 
service, the lack of comment regarding such for nearly 30 years 
after service, and the specific findings by a medical 
professional in 2009 as to the complete absence of medical 
evidence of shell fragment wounds.

The Board finds that the evidence fails to show any residuals of 
shell fragment wounds of the legs. 
Congress specifically limits entitlement for service- connected 
disease or injury to cases where such incidents have resulted in 
a disability. See 38 U.S.C.A. §§ 1110; 1131. In the absence of 
proof of present disability there can be no valid claim. Brammer 
v. Derwinski, 3 Vet. App. 223, 225 (1992); see also Degmetich v. 
Brown, 104 F.3d 1328 (1997) (38 U.S.C.A. § 1131 requires 
existence of present disability for VA compensation purposes); 
see also Wamhoff v. Brown, 8 Vet. App. 517, 521 (1996). Here, 
the evidence indicates no present residual of shell fragment 
wounds of the legs, and thus service connection is not warranted.

The Veteran has alleged that he has residuals of shell fragment 
wounds of the legs had their onset in service. As a lay person, 
however, the Veteran is not competent to give a medical opinion 
on the diagnosis or etiology of a condition. See Bostain v. 
West, 11 Vet. App. 124, 127 (1998), citing Espiritu v. Derwinski, 
2 Vet. App. 492 (1992). See also Routen v. Brown, 10 Vet. App. 
183, 186 (1997) ("a layperson is generally not capable of opining 
on matters requiring medical knowledge"). The Board observes 
that the Veteran is competent to report that he suffered injuries 
or shell fragment wounds to his legs during service, but, as 
discussed above, the Board finds that his statements in that 
regard are not credible. See Dalton, Caluza, supra. 

In short, there is no documentation of treatment during service 
for shell fragment wounds of the legs, and no probative post-
service diagnoses of residuals of shell fragment wounds. There 
is no basis with which to tie current complaints of residuals of 
shell fragment wounds of the legs to service. As the 
preponderance of the evidence is against a finding that the 
Veteran currently suffers from residuals of malaria, the claim 
must be denied. 38 .S.C.A. § 5107(b); Gilbert v. Derwinski, 1 
Vet. App. 49 (1990). 

II. Peripheral Vascular Disease of the Lower Extremities

The Veteran contends that he has peripheral vascular disease that 
is related to his period of service, or, more specifically, that 
is related to his residuals of shell fragment wounds of the legs. 

The Veteran's service treatment records do not show complaints, 
findings, or diagnoses of peripheral vascular disease of the 
lower extremities. 

The first post-service evidence of record of any peripheral 
vascular disease of the lower extremities is in November 1998, 
many years after the Veteran's period of service. This lengthy 
period without treatment is evidence against a finding of 
continuity of symptomatology, and it weighs heavily against the 
claim. See Maxson v. West, 12 Vet. App. 453 (1999), aff'd, 
230 F.3d 1330 (Fed. Cir. 2000) (service incurrence may be 
rebutted by the absence of medical treatment of the claimed 
condition for many years after service). 

A November 1998 VA general medical examination report noted that 
the Veteran was in Vietnam between 1966 and 1968. He stated that 
while he was in Vietnam, he was on patrol and the enemy came over 
and fired a rocket. The Veteran indicated that he suffered 
shrapnel injuries to both the right leg and to the right arm 
which resulted in some scar formation, but which were no longer a 
bother to him. He indicated that he had a femoral popliteal 
bypass graft done in July 1998 on the right side. The diagnoses 
included peripheral vascular disease; status post a femoral-
popliteal bypass graft on the right lower extremity with a 
pending femoral-popliteal bypass graft on the left lower 
extremity; prominence of the anterosuperior margin of the right 
talus; and radiographically normal knees. The diagnoses did not 
refer to any shell fragment wounds of the legs. 

A November 1998 VA orthopedic examination report essentially 
related the same information as to the Veteran's military 
service. The diagnoses were essentially the same as noted above 
and did not refer to any shell fragment wounds.

Post-service private and VA treatment records show treatment for 
peripheral vascular disease of the lower extremities on numerous 
occasions. 

A March 2003 bone scan report from Mercy Jeannette Hospital 
indicated that the Veteran reported that he had an injury to both 
lower legs during the Vietnam War and that he had metallic 
shrapnel in both lower legs. As to a conclusion, the examiner 
noted that the Veteran had "focal increased abnormal signal 
intensity in both lower legs, most likely related to injury from 
Vietnam War with shrapnel in both lower extremities." It was 
also reported that the remaining axial skeletal system appeared 
normal with no bone metastasis identified. 

A July 2009 VA arteries, veins, and miscellaneous examination 
report indicated that the Veteran's claims file was reviewed. 
The examination report was discussed in detail pursuant to the 
issue determined above. As to diagnoses, the examiner indicated 
that shell fragment wounds of the lower extremities between the 
ankles and the knees were not established at that time. The 
examiner stated that "there [was] no medical evidence, no 
evidence per claims file review, [and] no visualized scarring." 
The examiner commented that "any peripheral vascular disease of 
the lower extremities would not be secondary to shell fragment 
wound since no evidence is found. Most likely secondary to 
Veteran's history of smoking, hyperlipidemia, and alcohol 
intake." 

In evaluating the probative value of competent medical evidence, 
the United States Court of Appeals for Veterans Claims 
(hereinafter Court) has stated, in pertinent part:

The probative value of medical opinion 
evidence is based on the medical expert's 
personal examination of the patient, the 
physician's knowledge and skill in 
analyzing the data, and the medical 
conclusion that the physician reaches. . . 
. As is true with any piece of evidence, 
the credibility and weight to be attached 
to these opinions [are] within the province 
of the adjudicators; . . .

Guerrieri v. Brown, 4 Vet. App. 467, 470-71 (1993). 

As stated by the Court, the determination of credibility is the 
province of the Board. It is not error for the Board to favor 
the opinion of one competent medical expert over that of another 
when the Board gives an adequate statement of reasons or bases. 
See Owens v. Brown, 7 Vet. App. 429, 433 (1995). 

The Board notes that a March 2003 bone scan report from Mercy 
Jeannette Hospital indicated that the Veteran reported that he 
had an injury to both lower legs during the Vietnam War and that 
he had metallic shrapnel in both lower legs. As to a conclusion, 
the examiner noted that the Veteran had "focal increased 
abnormal signal intensity in both lower legs, most likely related 
to injury from Vietnam War with shrapnel in both lower 
extremities." It was also reported that the remaining axial 
skeletal system appeared normal with no bone metastasis 
identified. Although the report did not specifically refer to 
peripheral vascular disease, it did indicate a possible 
relationship between current additional leg problems and shell 
fragment wounds of the legs. The Board observes, however, that 
there is no indication that the examiner reviewed the Veteran's 
claims file in providing the opinion that the Veteran had focal 
increased abnormal signal intensity in the lower legs related to 
shrapnel injuries in both lower extremities from the Vietnam War. 
Although an examiner can render a current diagnosis based on his 
examination of a claimant, without a thorough review of the 
record, his opinion regarding etiology if based on facts reported 
by the claimant can be no better than the facts alleged by the 
claimant. See Swann v. Brown, 5 Vet. App. 229 (1993). 
Additionally, the Board observes that without a review of the 
claims file in this case, an examiner is unable to review the 
Veteran's medical history, and thereby provide a fully informed 
opinion. See also Nieves-Rodriguez v. Peake, 22 Vet. App. 295 
(2008). Given these circumstances, the opinion provided pursuant 
to the March 2003 bone scan report from Mercy Jeannette Hospital 
is not credible and has no probative value in this matter. 

Conversely, the Board notes that the July 2009 VA arteries, 
veins, and miscellaneous examination report indicated that the 
Veteran's claims file was reviewed. As to diagnoses, the 
examiner indicated that shell fragment wounds of the lower 
extremities between the ankles and the knees were not established 
at that time. The examiner stated that "there [was] no medical 
evidence, no evidence per claims file review, [and] no visualized 
scarring." The examiner commented that "any peripheral 
vascular disease of the lower extremities would not be secondary 
to shell fragment wound since no evidence is found. Most likely 
secondary to Veteran's history of smoking, hyperlipidemia, and 
alcohol intake." The Board notes that the VA examiner reviewed 
the Veteran's entire claims file, discussed his medical history, 
and provided rationales for her opinions. Therefore, the Board 
finds that the VA examiner's opinions are the most probative in 
this matter. See Wensch v. Principi, 15 Vet. App. 362 (2001). 

The Board observes that the probative medical evidence does not 
suggest that the Veteran's current peripheral vascular disease of 
the lower extremities is related to his period of service. In 
fact, the probative medical evidence provides negative evidence 
against this finding, indicating that the Veteran's current 
peripheral vascular disease of the lower extremities began many 
years after his period of service, without any relationship to 
any incident of service. 

The Veteran has alleged that his current peripheral vascular 
disease had its onset during his period of service, specifically 
as a shell fragment wounds. As a layperson, however, the Veteran 
is not competent to give a medical opinion on the diagnosis or 
etiology of a condition. See Bostain v. West, 11 Vet. App. 124, 
127 (1998), citing Espiritu v. Derwinski, 2 Vet. App. 492 (1992). 
See also Routen v. Brown, 10 Vet. App. 183, 186 (1997) ("a 
layperson is generally not capable of opining on matters 
requiring medical knowledge"). Additionally, as noted in the 
discussion of the issue above, the Board finds the Veteran's 
statements that he suffered shell fragment wounds during service 
to not be credible. See Dalton, Caluza, supra. 

Additionally, the Board notes that the Veteran is also attempting 
to establish service connection for peripheral vascular disease 
of the lower extremities as secondary to residuals of shell 
fragment wounds of the legs. The Board notes that secondary 
service connection presupposes the existence of an established 
service-connected disability. Residuals of shell fragment wounds 
of the legs are not currently service-connected, and thus, there 
can be no secondary service connection for any condition 
allegedly due to residuals of shell fragment wounds of the legs. 
Where the law and not the evidence is dispositive, a claim must 
be denied because of the absence of legal merit or lack of 
entitlement under the law. Sabonis v. Brown, 6 Vet.App. 426 
(1994). Since there is no legal basis for an award of secondary 
service connection for peripheral vascular disease of the lower 
extremities, as a matter of law the claim on that basis must be 
denied. Sabonis, supra.

The weight of the competent evidence demonstrates that the 
Veteran's peripheral vascular disease of the lower extremities 
began many years after his period of service and that it was not 
caused by any incident of service. This condition was neither 
incurred in nor aggravated by service. As the preponderance of 
the evidence is against the claim, the benefit-of-the-doubt rule 
does not apply, and the claim for service connection for 
peripheral vascular disease of the lower extremities, must be 
denied. 38 U.S.C.A. § 5107(b); Gilbert v. Derwinski, 1 Vet. App. 
49 (1990). 

III. Prostate Cancer

Disability ratings are determined by applying the criteria set 
forth in the VA Schedule for Rating Disabilities (Rating 
Schedule) and are intended to represent the average impairment of 
earning capacity resulting from disability. 38 U.S.C.A. § 1155; 
38 C.F.R. § 4.1. Disabilities must be reviewed in relation to 
their history. 38 C.F.R. § 4.1. The Board interprets reports of 
examination in light of the whole recorded history, reconciling 
the various reports into a consistent picture so that the current 
rating may accurately reflect the elements of disability. See 
38 C.F.R. § 4.2. Any reasonable doubt regarding the degree of 
disability will be resolved in favor of the claimant. 38 C.F.R. 
§ 4.3. Where there is a question as to which of two evaluations 
apply, the higher of the two will be assigned where the 
disability picture more nearly approximates the criteria for the 
next higher rating. 38 C.F.R. § 4.7. The Board will evaluate 
functional impairment on the basis of lack of usefulness, and the 
effects of the disabilities upon the person's ordinary activity. 
See 38 C.F.R. § 4.10. See Schafrath v. Derwinski, 1 Vet. 
App. 589 (1991). 

In general, the degree of impairment resulting from a disability 
is a factual determination and generally the Board's primary 
focus in such cases is upon the current severity of the 
disability. Francisco v. Brown, 7 Vet. App. 55, 57-58 (1994); 
Solomon v. Brown, 6 Vet. App. 396, 402 (1994). A recent decision 
of the Court has held that in determining the present level of 
disability for any increased evaluation claim, the Board must 
consider the application of staged ratings. See Hart v. 
Mansfield, 21 Vet. App. 505 (2007). In other words, where the 
evidence contains factual findings that demonstrate distinct time 
periods in which the service-connected disability exhibited 
diverse symptoms meeting the criteria for different ratings 
during the course of the appeal, the assignment of staged ratings 
would be necessary. In Fenderson v. West, 12 Vet. App. 119 
(1999), it was held that the rule from Francisco does not apply 
where the appellant has expressed dissatisfaction with the 
assignment of an initial rating following an initial award of 
service connection for that disability. Rather, from the time of 
an initial rating, separate ratings can be assigned for separate 
periods of time based on the facts found - a practice known as 
"staged" ratings. 

The RO has rated the Veteran's residuals of prostate cancer under 
Diagnostic Code 
7528, which pertains to malignant neoplasms of the genitourinary 
system and provides for up to a 100 percent disability rating. 
It also provides that following the cessation of surgical, X-ray, 
antineoplastic chemotherapy or other therapeutic procedure, the 
rating of 100 percent shall continue with a mandatory VA 
examination at the expiration of six months. 38 C.F.R. § 4.115b. 
Any change in evaluation based upon that or any subsequent 
examination shall be subject to the provisions of 38 C.F.R. § 
3.105(e). If there has been no local reoccurrence or metastasis, 
the disability is to be rated on residuals such as voiding 
dysfunction or renal dysfunction, whichever is predominant. Only 
the predominant area of dysfunction is to be considered for 
rating purposes to avoid violating the rule against the 
pyramiding of disabilities. 38 C.F.R. §§ 4.14, 4.115a. 

The Veteran was assigned an initial 100 percent rating for 
residuals of prostate cancer from January 21, 2003 to February 
28, 2004, and a noncompensable (0 percent) rating since March 1, 
2004 contentions pertain to the evaluation of the severity of the 
condition since March 1, 2004. 

The Veteran has not had any active malignancy since March 1, 
2004. 38 C.F.R. § 4.115b. As the Veteran has not had any active 
malignancy since that time, the Board finds that an assignment of 
a 100 percent disability rating under Diagnostic Code 7528 for 
the Veteran's residuals of prostate cancer would not be 
appropriate at any point since March 1, 2004. Accordingly, his 
disability will be rated on residuals such as voiding dysfunction 
or renal dysfunction. 

Voiding dysfunction is rated under the three subcategories of 
urine leakage, urinary frequency, and obstructed voiding. 38 
C.F.R. § 4.115a.

Evaluation under urine leakage involves ratings ranging from 20 
to 60 percent and contemplates continual urine leakage, post-
surgical urinary diversion, urinary incontinence, or stress 
incontinence. When these factors require the use of an appliance 
or the wearing of absorbent materials which must be changed more 
than four times per day, a 60 percent evaluation is warranted. 
When there is leakage requiring the wearing of absorbent 
materials which must be changed two to four times per day, a 40 
percent disability rating is warranted. A 20 percent rating 
contemplates leakage requiring the wearing of absorbent materials 
which must be changed less than two times per day. 38 C.F.R. § 
4.115a. 

Urinary frequency encompasses ratings ranging from 10 to 40 
percent. A 40 percent rating contemplates a daytime voiding 
interval less than one hour, or awakening to void five or more 
times per night. A 20 percent rating contemplates daytime 
voiding interval between one and two hours, or awakening to void 
three to four times per night. A 10 percent rating contemplates 
daytime voiding interval between two and three hours, or 
awakening to void two times per night. 38 C.F.R. § 4.115a. 

Finally, obstructed voiding entails ratings ranging from 
noncompensable to 30 percent. A 30 percent rating contemplates 
urinary retention requiring intermittent or continuous 
catheterization. A 10 percent rating contemplates marked 
obstructive symptomatology (hesitancy, slow or weak stream, 
decreased force of stream) with any one or combination of the 
following: (1) post-void residuals greater than 150 cubic 
centimeters (cc's); (2) uroflowmetry; markedly diminished peak 
flow rate (less than 10 cc's per second); (3) recurrent urinary 
tract infections secondary to obstruction; (4) stricture disease 
requiring periodic dilatation every two to three months. A 
noncompensable rating contemplates obstructive symptomatology 
with or without stricture disease requiring dilatation one to two 
times per year. 38 C.F.R. § 4.115a. 

Urinary tract infections requiring drug therapy, one to two 
hospitalizations per year and/or requiring intermittent intensive 
management warrant a 10 percent evaluation. A 30 percent rating 
is warranted for recurrent symptomatic infections requiring 
drainage/frequent hospitalization (greater than two times per 
year), and/or requiring continuous intensive management. Where 
urinary tract infections result in poor renal function, the 
disability is to be evaluated as poor renal function. 38 C.F.R. 
§ 4.115a. 

Renal dysfunction manifested by constant or recurring albumin 
with hyaline and granular casts or red blood cells, or transient 
or slight edema or hypertension at least 10 percent disabling 
under diagnostic code 7101 warrants a 30 percent evaluation. 
Renal dysfunction resulting in albuminuria with some edema, or 
definite decrease in kidney function, or hypertension at least 40 
percent disabling under diagnostic code 7101 warrants a 60 
percent evaluation. Renal dysfunction manifested by persistent 
edema and albuminuria with BUN 40 to 80mg%, or creatinine 4 to 
8mg%, or generalized poor health characterized by lethargy, 
weakness, anorexia, weight loss, or limitation of exertion, 
warrants an 80 percent evaluation. Finally, renal dysfunction 
that requires regular dialysis, or precludes more than sedentary 
activity from one of the following: persistent edema and 
albuminuria; or BUN more than 80mg%; or creatinine more than 
8mg%; or markedly decreased function of kidney or other organ 
systems, especially cardiovascular, warrants a 100 percent 
evaluation. 38 C.F.R. § 4.115a.

The medical evidence associated with the claims file does not 
reflect that the Veteran has experienced renal dysfunction or 
recent urinary tract infections. Accordingly, the Board 
concludes that voiding dysfunction is the Veteran's predominant 
complaint. 

An April 2004 VA genitourinary examination report noted that the 
Veteran was found to have a prostate-specific antigen (PSA) of 
4.62 in February 2003 and that he was also felt to have at least 
a unilateral, if not bilateral, abnormality on a rectal 
examination of the prostate. It was reported that the Veteran 
underwent a needle biopsy in March 2003, which showed a Gleason 
sum of 5+4=9, on the left. The examiner indicated that a staging 
bone scan, computed tomography scan, and chest X-ray were 
negative for metastatic disease. The examiner stated that 
because of the high Gleason score, the Veteran elected to undergo 
radiation therapy. The Veteran reported that prior to his 
radiation therapy, he did have some symptoms of a weak urinary 
stream, but he denied that he had any dysuria or hematuria. The 
Veteran indicated that, presently, he believed that he generally 
emptied well. He denied that he had any incontinence and he 
stated that he did not require a pad. The Veteran remarked that 
he had not had any erection since his radiation therapy. It was 
noted that an April 2004 PSA was 1.2. 

The examiner reported that the Veteran's genitourinary 
examination showed a normal penis without probable plaques or 
urethral discharge. The examiner stated that the Veteran's 
testicles were descended, bilaterally, and that they were 
nontender to palpation. The examiner indicated that the Veteran 
had no palpable inguinal adenopathy or inguinal hernia. It was 
noted that the Veteran refused a rectal examination. As to an 
assessment, the examiner indicated that the Veteran had clinical 
T2b2 T2c disease prior to his radiation therapy. The examiner 
noted that the Veteran's PSA had declined from 4.6 to a 0.5 
nadir, with the most recent PSA of 1.2 in April 2004. The 
examiner commented that the Veteran did not have any problems 
with urinary control and that he did not have any erections at 
that time. 

Private treatment records dated from April 2004 to May 2008 show 
treatment for multiple disorders. 

The most recent July 2009 VA arteries, veins, and miscellaneous 
examination report noted that the Veteran reported that he was 
not employed currently and that he previously worked as a truck 
driver. The Veteran indicated that he was on disability for 
approximately the last ten years due mainly to his circulation in 
his legs, which interfered with his ability to work. He stated 
that he was diagnosed and treated for prostate cancer six years 
ago. He reported that he received forty-nine radiation 
treatments, five days a week, until the treatment was completed. 
The Veteran indicated that he had received no additional 
treatment since that time other than for follow-ups with PSA 
studies, which had been within normal limits. 

The examiner indicated that the Veteran was not reporting 
lethargy, weakness, anorexia, or weight loss. The examiner 
reported that the Veteran did have nighttime urination every two 
hours and daytime urination every two hours, more or less 
depending on fluid intake. It was noted that the Veteran stated 
that he had occasional hesitancy, but that he denied any urine 
stream abnormalities. The examiner indicated that the Veteran 
denied that he had any dysuria or hematuria. The examiner 
reported that the Veteran denied that he had any incontinence of 
urine, and that he had not undergone any surgery to any part of 
his urinary tract. The examiner stated that the Veteran denied 
that he had recurrent urinary tract infections, renal colic, 
bladder stones, or acute nephritis. It was also noted that the 
Veteran denied that he had any hospitalizations for urinary tract 
disease, and that he denied that he had any neoplasms, cancers, 
or abnormalities of the penis, testicles, or scrotum. The 
examiner indicated that the Veteran did report erectile 
dysfunction, which started approximately one year prior to his 
diagnosis of prostate cancer. The examiner noted that the 
Veteran indicated that he had decreased function in the beginning 
in 2001, and no erectile function at all presently. The Veteran 
reported that he had not tried any medications because he was not 
eligible due to his heart condition. The examiner stated that a 
July 2008 PSA was normal at 0.51. The diagnoses included 
prostate cancer, treated, in remission, with residual erectile 
dysfunction. 

Viewing all the evidence, the Board finds that continuously since 
March 1, 2004, there is a reasonable basis for finding that the 
criteria for a 20 percent rating for the Veteran's prostate 
cancer are met. As noted above, the medical evidence indicates 
that voiding dysfunction is the Veteran's predominant complaint 
regarding his residuals of prostate cancer. The Board observes 
that the Veteran does not have renal dysfunction or any recent 
urinary infections. The Board notes, however, that the Veteran 
has been shown to have voiding dysfunction, or more specifically, 
urinary frequency. The most recent July 2009 VA arteries, veins, 
and miscellaneous examination report noted that the Veteran did 
have nighttime urination every two hours and daytime urination 
every two hours, more or less depending on fluid intake. The 
examiner also reported that the Veteran stated that he had 
occasional hesitancy, but that he denied any urine stream 
abnormalities. The Board observes that the April 2004 VA 
genitourinary examination report noted that the Veteran stated 
that prior to his radiation therapy, he did have some symptoms of 
a weak urinary stream, but he denied that he had any dysuria or 
hematuria. The Veteran indicated that, presently, he believed 
that he generally emptied well. The Board notes that the April 
2004 VA genitourinary examination report did not specifically 
provide information as to the Veteran's urinary frequency. The 
Board notes, therefore, that pursuant to the July 2009 VA 
arteries, veins, and miscellaneous examination report, there is 
evidence that the Veteran has urinary frequency with a daytime 
voiding interval between one and two hours, or awakening to void 
three to four times per night, as required for a 20 percent 
rating pursuant to 38 C.F.R. § 4.115a. 

The Board observes that the evidence does not indicate that the 
Veteran has a daytime voiding interval of less than one hour, or 
awakening to void five or more times per night as required for a 
40 percent rating pursuant to 38 C.F.R. § 4.115a. Additionally, 
there is no evidence of continual urine leakage or urinary 
incontinence requiring the wearing of absorbent materials which 
must be changed two to four times per days as required for a 
higher 40 percent rating pursuant to the criteria for urine 
leakage under 38 C.F.R § 4.115a. Further, the criteria as to 
obstructive voiding and urinary tract infections are not 
applicable in this case because the Veteran does not have such 
symptomatology. See 38 C.F.R. § 4.115a. 

As this is an initial rating case, consideration has been given 
to "staged ratings" (different percentage ratings for different 
periods of time, since the effective date of service connection, 
based on the facts found). Fenderson v. West, 12 Vet.App. 119 
(1999). However, staged ratings are not indicated in the present 
case, as the Board finds the Veteran's residuals of prostate 
cancer have continuously been 20 percent disabling since March 1, 
2004, when the Veteran's 100 percent rating was reduced to a 
noncompensable (0 percent) rating. 

The Board has also considered whether the record raises the 
matter of extraschedular ratings under 38 C.F.R. § 3.321(b)(1) 
(2009). The evidence does not reflect that the Veteran's 
prostate cancer, alone, has caused marked interference with 
employment (i.e., beyond that already contemplated in the 
assigned rating), or necessitated frequent periods of 
hospitalization, such that application of the regular schedular 
standards is rendered impracticable. Based on the foregoing, the 
Board finds that referral for consideration of assignment of 
extra-schedular ratings is not warranted. 38 C.F.R. § 
3.3219(b)(1). 

Thus, an increased rating to 20 percent, continuously since March 
1, 2004, for prostate cancer, is granted. The Board has 
considered the benefit-of-the-doubt rule in making the current 
decision. 38 U.S.CA. § 5107(b); Gilbert v. Derwinski, 1 Vet.App. 
49 (1990). 

IV. Erectile Dysfunction

When a condition is not listed in the schedule, it will be 
permissible to rate it under a closely-related disease or injury 
in which not only the functions affected, but also the anatomical 
localization and symptomatology are closely analogous. 38 C.F.R. 
§ 4.20 (2009). The Veteran's service- connected erectile 
dysfunction may be rated by analogy to penis deformity, with loss 
of erectile power. 38 C.F.R. §§ 4.20, 4.115(b) Diagnostic Code 
7522 (2009). The Board can identify no more appropriate 
diagnostic code and the Veteran has not identified one. See 
Butts v. Brown, 5 Vet. App. 532, 538 (1993). 

Diagnostic Code 7522 provides a single 20 percent rating where 
the evidence shows deformity of the penis with loss of erectile 
power. 38 C.F.R. § 4.115(b), Diagnostic Code 7522. When the 
requirements for a compensable rating of a diagnostic code are 
not shown, a 0 percent rating is assigned. 38 C.F.R. § 4.31. 

The RO has assigned a noncompensable (0 percent rating) for 
erectile dysfunction, effective January 21, 2003 (the effective 
date of service connection). The Board notes that the Veteran 
has also been granted special monthly compensation based on loss 
of use of a creative organ, due to erectile dysfunction. 

The relevant medical evidence regarding the Veteran's service-
connected erectile dysfunction was reported pursuant the 
discussion of the issue of entitlement to a higher rating for 
prostate cancer, noted above. 

The medical evidence does not show any penile deformity. 
Although there is evidence of the Veteran reporting an inability 
to achieve and/or maintain erections, there is essentially no 
evidence of any testicular or penile deformities. Absent 
evidence of penile deformity, even though there is erectile 
dysfunction, a compensable rating is not warranted under 
Diagnostic Code 7522. As the requirements for a compensable 
rating under Diagnostic Code 7522 are not met, a noncompensable 
(0 percent) rating is proper pursuant to 38 C.F.R. § 4.31. 

This is an initial rating case, on the granting of service 
connection. The Board finds that there are no distinct periods 
of time, since the effective date of service connection, during 
which the Veteran's erectile dysfunction has been more than 0 
percent disabling. Thus "staged ratings" greater than a 0 
percent rating are not warranted for any period of time since the 
effective date of service connection. Fenderson v. West, 12 
Vet.App. 119 (1999). 

The Board has also considered whether the record raises the 
matter of extraschedular ratings under 38 C.F.R. § 3.321(b)(1) 
(2009). The evidence does not reflect that the Veteran's 
erectile dysfunction, alone, has caused marked interference with 
employment (i.e., beyond that already contemplated in the 
assigned rating), or necessitated frequent periods of 
hospitalization, such that application of the regular schedular 
standards is rendered impracticable. Based on the foregoing, the 
Board finds that referral for consideration of assignment of 
extra-schedular ratings is not warranted. 38 C.F.R. § 
3.3219(b)(1). 

As the preponderance of the evidence is against the claim for a 
higher (compensable) rating for erectile dysfunction, the 
benefit-of-the-doubt rule does not apply, and the claim must be 
denied. 38 U.S.C.A. § 5107(b); Gilbert v. Derwinski, 1 Vet.App. 
49 (1990). 


ORDER

Service connection for residuals of shell fragment wounds of the 
legs is denied. 

Service connection for peripheral vascular disease of the lower 
extremities is denied. 

A higher rating of 10 percent, but not greater, is granted for 
prostate cancer continuously since March 1, 2004, subject to the 
laws and regulations governing the disbursement of monetary 
benefits. 

An initial higher (compensable) rating for erectile dysfunction 
is denied. 


REMAND

The remaining issue on appeal is entitlement to service 
connection for a psychiatric disorder, to include PTSD. The 
Board finds that there is a further VA duty to assist the Veteran 
in developing evidence pertinent to those claims. 38 U.S.C.A. 
§ 5103A; 38 C.F.R. § 3.159. 

Service connection for PTSD requires medical evidence diagnosing 
the condition in accordance with 38 C.F.R. § 4.125(a) [i.e. under 
the criteria of DSM-IV]; a link, established by medical evidence, 
between current symptoms and an in-service stressor; and credible 
supporting evidence that the claimed in-service stressor 
occurred. If the evidence establishes that the Veteran engaged 
in combat with the enemy and the claimed stressor is related to 
that combat, in the absence of clear and convincing evidence to 
the contrary, and provided the claimed stressor is consistent 
with the circumstances, conditions, or hardships of the Veteran's 
service, the Veteran's lay testimony alone may establish the 
occurrence of the claimed in-service stressor. 38 C.F.R. 
§ 3.304(f). 

When the evidence does not establish that a veteran is a combat 
veteran, his assertions of service stressors are not sufficient 
to establish the occurrence of such events. Rather his alleged 
service stressors must be established by official service record 
or other credible supporting evidence. 38 C.F.R. § 3.304(f); 
Pentecost v. Principi, 16 Vet. App. 124 (2002); Fossie v. West, 
12 Vet. App. 1 (1998); Cohen v. Brown, 10 Vet. App. 128 (1997); 
Doran v. Brown, 6 Vet. App. 283 (1994). 

The Veteran claims service connection for a psychiatric disorder, 
to include PTSD, as a result of his period of service. His 
service personnel records indicate that he was not awarded 
decorations evidencing combat. He had one year and twenty-seven 
days of foreign and/or sea service. His occupational specialty 
was listed as a combat engineer. A January 2004 response from 
the National Personnel Records Center (NPRC) indicated that the 
veteran served in Vietnam from July 1966 to January 1967 and from 
March 1967 to August 1967. His service personnel records also 
included notations that he participated in counter-insurgency 
operations in the Republic of Vietnam with "III MAF" and that 
he participated in Operation Prairie, Phase III, in the Quan Tri 
Province of the Republic of Vietnam. He served with various 
companies in the 3rd Marine Division and the 9th Marine Division 
in Vietnam. 

The Veteran's service medical records do not show complaints, 
findings, or diagnoses of PTSD or any other psychiatric problems. 
Evaluations of the Veteran during that time make no reference to 
any such disorders. 

Post-service private and VA treatment records show treatment for 
disorders including psychiatric problems. There is no evidence 
of treatment for PTSD. 

The Veteran has reported various stressors. A November 1998 RO 
general medical examination report noted that the Veteran was in 
Vietnam between 1966 and 1968. He reported that he was in an 
infantry division and that he served all over Vietnam. He stated 
that while he was in Vietnam, he was on patrol and the enemy came 
over and fired a rocket. The Veteran indicated that he suffered 
shrapnel injuries to the right leg and to the right arm which 
resulted in some scar formation, but which was no longer a bother 
to him. He reported that he was involved in five combat 
situations while he was in Vietnam and that he was wounded. The 
diagnoses did not refer to any shell fragment wounds or to PTSD 
or to any psychiatric disorders. 

A November 1998 VA orthopedic examination report essentially 
related the same information as to the veteran's military 
service. The diagnoses did not refer to any shell fragment 
wounds. 

In an October 2003 response to PTSD stressor questionnaire, the 
Veteran reported that he was assigned to the 3rd Marine Division 
and that he served in many companies. He stated that he was in 
Da Nang, Ahn Hoa, Dong Ha, and the surrounding areas. He 
indicated that he was with a lot of companies because of his 
occupational specialty. The Veteran reported that he carried C-4 
for mines, booby traps, and tunnels. He stated that he served at 
many outposts and that he went out on patrol and did his thing 
with explosives. 

An April 2004 VA psychiatric examination report noted that the 
Veteran served in the Marine Corps between March 1966 and March 
1969. He reported that that he was in Vietnam for approximately 
fourteen months between 1966 and 1968, but that he could not be 
more specific about the dates. The Veteran indicated that he was 
with the 3rd Marine Division as a combat engineer, but that he 
could not provide more specific information concerning the outfit 
to which he was assigned. The Veteran stated that he was 
assigned to a number of different outfits as he traveled around 
the country as a demolition expert. It was noted that the 
Veteran thought he was part of the 1st Battalion of the 9th 
Marines; the 3rd Battalion of the 9th Marines; and of the 26th 
Regiment of the 1st and 2nd Marine Division. It was also 
reported that the Veteran was very confused about providing such 
information. The Veteran further stated that he thought that he 
spent time near Da Nang Ahn Hoa and Dong Ha. 

The Veteran reported that he worked as a demolitions expert and 
that he would blow up booby traps, mines, and tunnels to keep the 
troops safe. He stated that he would also set up demolition 
traps for the enemy and to protect US troops. He indicated that 
he went on many patrols and that he was assigned to many units. 
The Veteran claimed that he was exposed to rocket and mortar 
attacks on frequent occasions and that he went into tunnels 
periodically to clear them. He reported that he was hit in both 
legs by shell fragments from a rocket attack near Dong Ha, but 
that he did not know exactly when such occurred. He stated that 
he refused the Purple Heart Medal at that time, but that he was 
currently trying to receive it. It was noted that the Veteran 
had no history of formal psychiatric treatment. The examiner 
indicated, as to an impression, that based on a review of the 
Veteran's available medical records, including his claims file, 
as well as the currently conducted clinical examination, and 
assuming that the information gathered was factual and accurate, 
it was his opinion that the Veteran exhibited the following 
disorders: dysthymic disorder, secondary to medical 
difficulties, and alcohol dependence, active. The examiner 
commented that "the Veteran [did] not meet diagnostic criteria 
for the diagnosis of PTSD in terms of an identifiable specific 
stressor that [met] criteria A for the diagnosis, at least in 
terms of information presented." The examiner indicated that 
the Veteran complained of some symptoms of PTSD, but without a 
specific indentified stressor, the diagnosis could not be made. 
The examiner stated that the Veteran did meet the criteria for 
depression that was secondary to multiple medical problems and 
unrelated to his military service. 

An April 2004 consultation report from Mercy Jeannette Hospital 
indicated, as to medications, that the Veteran was taking Zoloft 
for depression following a prostate cancer diagnosis. It was 
noted that the Veteran had a Vietnam War injury in the lower leg 
with fragments of metal left in. Diagnoses were not provided. 

The Board observes that the Veteran served in Vietnam from July 
1966 to January 1967 and from March 1967 to August 1967. The 
Veteran has specifically stated that he was exposed to rocket and 
mortar attacks on frequent occasions during his time in Vietnam. 
He also reported that he served in Da Nang, Ahn Hoa, and Dong Ha. 
His service personnel records indicate that he participated in 
counter-insurgency operations in the Republic of Vietnam with 
"III MAF" and that he participated in Operation Prairie, Phase 
III, in the Quan Tri Province of the Republic of Vietnam. He 
served with various companies in the 3rd Marine Division and the 
9th Marine Division in Vietnam. The Board observes that a mortar 
attack on one's unit may be accepted as a stressor event that 
could be verified and, in some cases, form the basis of a PTSD 
diagnosis. See Pentecost v. Principi, 16 Vet. App. 124 (2002). 

The Board notes that there is no indication in the record that 
there has been an attempt to verify the Veteran's reported 
stressors through the U.S. Army and Joint Services Records 
Research Center (JSRRC). Therefore, the Board is of the view 
that an attempt to verify the Veteran's alleged stressors and to 
obtain relevant unit histories should be made. 

Additionally, the Board observes that the December 2009 joint 
motion (noted above in the INTRODUCTION) indicated that the Board 
should make a finding whether the evidence establishes that the 
Veteran was a combat Veteran and, if necessary, obtain a new 
examination to determine whether the Veteran has PTSD, and, if 
so, whether it is related to service. 

Consequently, the Veteran should also be afforded a VA 
examination with the goal of arriving at an opinion as to the 
etiology of any current psychiatric disorder, to include PTSD. 
Such an examination should be accomplished on remand. 38 C.F.R. 
§ 3.159(c)(4). 

Prior to the examinations, any outstanding records of pertinent 
treatment should be obtained and added to the record. 

Accordingly, these issues are REMANDED for the following: 

1. Ask the Veteran to identify all medical 
providers who have treated him for 
psychiatric problems since May 2008. After 
receiving this information and any 
necessary releases, contact the named 
medical providers and obtain copies of the 
related medical records which are not 
already in the claims folder. 

2. Contact the Veteran and ask him to 
provide specific details for each stressful 
event he reports having occurred during 
service. The details should include names, 
dates, locations, unit affiliations, or any 
other identifying information that would 
assist in efforts to attempt to verify the 
occurrence of the reported events. The 
Veteran should be informed that the details 
in his response are very important to his 
claim. 

3. Request that the U.S. Army and Joint 
Services Records Research Center (JSRRC), 
or other official sources such as the Naval 
Historical Center, investigate and attempt 
to verify the Veteran's alleged stressors, 
to specifically include rocket and mortar 
attacks while he served in Vietnam from 
July 1966 to January 1967 and from March 
1967 to August 1967 and served in Da Nang, 
Ahn Hoa, and Dong Ha. JSRRC should also be 
asked to provide the histories of the 
Veteran's units during the time he was in 
Vietnam. If more detailed information is 
need for this research, the Veteran should 
be given and opportunity to provide it. 

4. Schedule the Veteran for a VA examination 
by a psychiatrist to determine the nature and 
etiology of any current psychiatric disorder. 
The claims folder must be provided to and 
reviewed by the examiner in conjunction with 
the examination. The examiner should 
diagnose all current psychiatric disorders. 
Following review of the claims file and 
examination of the Veteran, the examiner 
should provide a medical opinion, with 
adequate rationale, as to whether it is more 
likely, less likely, or at least as likely as 
not (50 percent probability), that any 
currently diagnosed psychiatric disorders are 
etiologically related to the Veteran's period 
of service. If PTSD is diagnosed the 
examiner should specify the stressor(s) upon 
which the diagnosis was based. If not, the 
examiner should then opine as to whether the 
Veteran's service-connected prostate cancer 
aggravated (permanently worsened beyond the 
natural progression) any diagnosed 
psychiatric disorders, and if so, the extent 
to which they are aggravated. Any opinions 
expressed by the examiner must be accompanied 
by a complete rationale. 

5. Thereafter, review the Veteran's claims 
for entitlement to service connection for a 
psychiatric disorder, to include PTSD. If 
any benefit sought is denied, issue a 
supplemental statement of the case to the 
Veteran and his representative, and provide 
an opportunity to respond, before the case is 
returned to the Board. 

The purposes of this remand are to ensure notice is complete, and 
to assist the Veteran with the development of his claim. The 
appellant has the right to submit additional evidence and 
argument on the matter the Board has remanded. Kutscherousky v. 
West, 12 Vet. App. 369 (1999). 

No action is required of the appellant until further notice. 
However, the Board takes this opportunity to advise the appellant 
that the conduct of the efforts as directed in this remand, as 
well as any other development deemed necessary, is needed for a 
comprehensive and correct adjudication of his claim. His 
cooperation in VA's efforts to develop his claims, including 
reporting for any scheduled VA examination, is both critical and 
appreciated. The appellant is also advised that failure to 
report for any scheduled examination may result in the denial of 
a claim. 38 C.F.R. § 3.655. 


[Continued on following page.]


This claim must be afforded expeditious treatment. The law 
requires that all claims that are remanded by the Board of 
Veterans' Appeals or by the United States Court of Appeals for 
Veterans Claims for additional development or other appropriate 
action must be handled in an expeditious manner. See 38 U.S.C.A. 
§§ 5109B, 7112 (West Supp. 2007).



______________________________________________
DENNIS F. CHIAPPETTA
Veterans Law Judge, Board of Veterans' Appeals



 Department of Veterans Affairs